UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BYUNG KIM AND YONG KIM,       §
                              §
        Plaintiffs,           §
                              §
v.                            §    CIVIL ACTION NO. 4:07-cv-4201
                              §
TIME INSURANCE COMPANY        §
                              §
        Defendant.            §

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment.   (Doc. No. 67.)

After considering the arguments made in briefing and the relevant law, the Court finds that

Defendant's Motion should be denied in part and granted in part.

### I.    Background

Plaintiffs Yong Kim and Byung Kim are suing Defendant Time Insurance Company

("Time") for its failure to cover Yong Kim's treatment for liver disease.  The timeline leading to

the filing of this case is fact intensive and must be reviewed with care.  In February 2007, Koo

Kim, Plaintiffs' son, began telling his parents that they should acquire health insurance.[1]  (Koo

Kim Dep. 26:18-21, Feb. 29, 2008.)  It had been at least ten years since his parents had been

covered by health insurance.  (Byung Kim Dep. 7:21-10:9, Feb. 11, 2008.)  Shortly thereafter,

Koo himself completed an online health insurance application for his parents, and he began to

receive numerous telephone calls from "tons" of insurance agents.  (Koo Kim Dep. 27:12-15.)

In July 2007, Agent Travis Stephens ultimately convinced Koo to buy Plaintiffs a health

---

[1] The facts presented here are undisputed or, for the purposes of this motion only, presented in the light most favorable to Plaintiffs.

insurance policy from Assurant Health Insurance, now known as Time Insurance Company.[2]

(*Id.* at 28:17-25.)  The policy contained a Pre-Existing Condition Limitation, which stated that

Time would not cover a pre-existing condition, or resulting complication, "until the Covered

Person has been continuously covered under this plan for 12 months." (Doc. No. 67, Ex. 4 at

73.)  The policy defines a Pre-Existing Condition as follows:

> A sickness or an injury and related complications:
>
> 1. For which medical advice, diagnosis, care or treatment was sought, received, or recommended from a provider or Prescription Drugs were prescribed during the 12 month period immediately prior to the Covered Person's Effective Date, regardless of whether the condition was diagnosed, misdiagnosed, or not diagnosed; or
>
> 2. That produced symptoms during the 12 month period immediately prior to the Covered Person's Effective Date which reasonably should have caused or would have caused an ordinarily prudent person to seek diagnosis or treatment.

(*Id.*)  The policy became effective on July 17, 2007.  (Doc. No. 75, Ex. A at 5.)

On July 20, 2007, Soyoung Kim, Plaintiffs' daughter, took Plaintiff Yong Kim to

Metroplex Hospital in Kileen, Texas, because she was suffering from shortness of breath and

pain in her abdomen. (Soyoung Kim Dep. 28:20-24, Feb. 12, 2008.)  Plaintiff Yong Kim was 62

years-old at the time.  (Doc. No. 75, Ex. E.)  For the preceding ten years (Byung Kim Dep.

41:18-42:3), Plaintiff Yong Kim had suffered from constipation, which she treated herself by

taking Zantac, Dulcolax, and Metamucil. (*Id.* at 43:5-6; Soyoung Kim Dep. 24:19-25.)  She

had never seen a doctor regarding her constipation.  (Soyoung Kim Dep. 42:11-44:5.)  With the

exception of a visit to the Metroplex emergency room for a head injury in 2005 (*Id.* at 22:7-11),

she had not seen a doctor in five years.  (*Id.* at 10:16.)

Prior to her hospital admission, Plaintiff Yong Kim had been suffering from abdominal

cramping for two to three weeks.  (Yong Kim Dep. 9:8-11, March 31, 2008.)  The cramping was

---

[2] For clarity's sake, the Court will hereafter refer to both Assurant Health Insurance and Time Insurance Company as "Time."

very painful, and at times it caused her to double over.  (*Id.* at 12:20-13:5.)  Around July 4, 2007,
the pain was bad enough that she felt she needed to see a doctor (*Id.* at 13:20-23); in the past, she
had told Koo Kim "very often" that she needed to go to the hospital.  (*Id.* at 21:19-20.)

According to the Metroplex records of her hospital visit, Plaintiff Yong Kim complained
of moderate abdominal pain and swelling, swelling in her legs and ankles, and constipation.
(Doc. No. 75 at Ex. E.)  The abdominal pain had been occurring approximately two times per
week.  (*Id.*)  The records also note that she had had blood in her stool, after using an enema, two
weeks before admission.  (*Id.*)  Metroplex performed a CT scan and diagnosed Plaintiff Yong
Kim with cirrhosis, moderate ascites, portal hypertension with splenomegaly, colonic
diverticulosis, and mild edema.  (*Id.*)

On July 21, 2007, Plaintiff Yong Kim was transferred from Metroplex to Scott and White
Hospital in Temple, Texas.  (Doc. No. 67, Ex. 1 at 5.)  According to the medical records from
that visit, her abdominal pain began approximately two weeks prior to admission, and the pain
was characterized as "sharp."  (*Id.*)  She reportedly had had a fever for two to three days.  (*Id.*)
The records reflect that Plaintiff Yong Kim had last felt well about a year before, and since then
she had suffered from intermittent epigrastic cramping that lasted for two to three minutes at a
time, once or twice a day.  (*Id.* at 15-16.)  This cramping-like pain had increased in duration and
frequency about three weeks prior to admission, around July 4, 2007, and in late July lasted for
about 20-25 minutes at a time, three times a day.  (*Id.* at 16.)

The Scott and White records stated that she had been treating the pain with Zantac for the
past month, but had not experienced any relief.  (*Id.*)  In the previous two days she had suffered
from distension in her abdomen and swelling in her ankles, "new symptoms" for her.  (*Id.*)  Her
abdomen was mild to moderately tender to the touch.  (*Id.*)  The records also reflect that Plaintiff

3

Yong Kim reported a 10 year history of constipation, which she had treated with over-the-counter enemas and fiber supplements. (*Id.* at 19.) When asked to rate her pain, Plaintiff Yong Kim reported it to be 3 out of 10, but she stated that it intermittently rose to 10 out of 10. (*Id.* at 21.) She told the doctors that she had "never had problems like this before." (*Id.* at 16.) In contrast to the Metroplex records, doctors at Scott and White reported that she had observed blood in her stool one day, not two weeks, prior to admission. (*Id.* at 16.)   Scott and White performed a full work-up, which revealed that Plaintiff Yong Kim's cirrhosis was secondary to Hepatitis B. (Doc. 67, Ex. 23 at 13.)

On July 30, 2007, doctors performed a biopsy on Yong Kim's liver; the results were inconclusive for cancer. (Pls.' Compl. ¶ 5.) On August 4, another biopsy revealed that Plaintiff Yong Kim had hepatocellular carcinoma (HCC), a form of liver cancer. (*Id.*) Plaintiff was discharged from Scott and White Hospital on September 3, 2007 and admitted to Methodist Hospital in Houston, Texas, on September 4, 2007. (*Id.*) On September 13, 2007, Plaintiff Yong Kim was transferred to St. Luke's Episcopal Hospital, where she continues to be treated on both an inpatient and outpatient basis for HCC. (*Id.*)

Time first received claims from Plaintiffs on August 6, 2007. (Dix. Aff. ¶ 4, Sept. 5, 2008.) Time classifies claims for liver disease and cancer as "high risk/high dollar claims." (Doc. No. 75, Ex. Q.) On August 10, 2007, Time sent a letter to Plaintiffs acknowledging receipt of their claims and requesting the contact information of their primary care physician. (Doc. No. 67, Ex. 15.) Between September 25, 2007 and September 27, 2007, Time received the final medical records from Scott and White needed to determine Plaintiffs' claims. (Doc. No. 75, Ex. O.) On September 27, 2008, after reviewing the medical records from Scott and White and Metroplex (Brumblay Dep. 56:4-18, Feb. 22, 2008), Dr. Scott Brumblay, a Medical Director at

4

Time (Laabs Dep. 9:13, Feb. 22, 2008), determined that Plaintiff Yong Kim's liver condition

was a pre-existing condition not covered by the policy. (Doc. No. 75, Ex. O.)  Dr. Brumblay did

not consult any medical literature or studies before reaching his conclusion. (Brumblay Dep.

36:18-25.)

Time informed Plaintiffs of Dr. Brumblay's decision in a letter dated September 27,

2008.[3] (Doc. No. 75, Ex. M.) The letter stated that Plaintiff Yong Kim's condition, for which

she received treatment from July 20, 2007 to September 4, 2007, manifested itself before her

policy became effective on July 17, 2007. (*Id.*) The letter contained the following language:

> The policy specifically excludes coverage for pre-existing conditions defined under the
> policy as:
>
> Pre-Existing Condition:  An illness or injury and related complications of a covered
> person, if during the 12 month period immediately prior to the covered person's effective
> date:
>
> 1) The covered person received medical treatment diagnosis, consultation or service, or
>    took prescription drugs or medicine for the condition, or
>
> 2) The condition produced symptoms that would cause an ordinarily prudent person to
>    seek diagnosis, care or treatment.

(*Id.*)

Following Time's denial of Plaintiffs' claims, Dr. Rise Stribling, Plaintiff Yong Kim's

treating physician (Stribling Dep. 4:16-17), wrote to Time inquiring why Time had not

authorized Yong Kim's liver transplant. (Doc. No. 67, Ex. 15; Beckman Dep. 9:11-10:2, Feb.

22, 2008.)   In response to Dr. Stribling's inquiries, Dr. Kenneth Beckman, Time's Chief

Medical Director, reviewed Plaintiff Yong Kim's medical records and Dr. Brumblay's initial

determination. (Beckman Dep. 10:17.) He concurred with Dr. Brumblay's conclusion that

---

[3] Plaintiffs' allege that they did not receive the letter until October 8, 2007. (Pls.' Compl. ¶ 8.)

Plaintiff Yong Kim's liver disease was pre-existing.  (*Id.* at 18:18-21.)  He explained his decision to Dr. Stribling in writing on October 8, 2007.  (Doc. No. 67, Ex. 19.)

In November 2007, Plaintiffs appealed the denial.  (Doc. No. 67, Ex. 15.)  Dr. John Laabs, another Medical Director (Laabs Dep. 9:23-35), reviewed Dr. Brumblay's initial decision. (Doc. No. 67, Ex. 15.)  In conducting his review, he did not consult any medical literature or studies.  (Laabs Dep. 29:18-30:5.)  Dr. Laabs did not consult Dr. Brumblay's notes or speak with Dr. Brumblay before he made his decision; instead, it is his practice to look at his appeals "new and fresh."  (*Id.* at 19:1-4.)  He determined that Plaintiff Yong Kim's pre-existing condition was cirrhosis of the liver (*Id.* 26:25-27:1), and that her cancer, ascites, and spontaneous bacterial peritonitis ("SBP") were resulting complications of that condition.  (*Id.* at 27:3-20.)  As such, he upheld Dr. Brumblay's initial decision to deny Plaintiff Yong Kim's claim.  Plaintiffs were notified of his decision by letter on November 27, 2007.  (Doc. No. 67, Ex. 15.)

On December 26, 2007, a surgical pathology report, which was submitted with Plaintiff Yong Kim's medical records, listed diverticulitis as a diagnosis.  (Doc. No. 75, Ex. P.)  Dr. Brumblay requested additional medical records to understand how Plaintiff Yong Kim's doctors had reached that diagnosis, but he never received any such records.  (Brumblay Dep. 67:6-11.) On April 9, 2008, Dr. Brumblay determined that Plaintiff Yong Kim's diverticulitis was "incidental" to the discovery of her liver disease and HCC; therefore, it did not meet the definition of "pre-existing condition" set forth in her policy.  (Doc. No. 75, Ex. P.)  Time has since paid $390,616.91 to cover the cost of Plaintiff Yong Kim's diverticulitis treatment.  (Dix. Aff. ¶ 4.)

Plaintiffs sued Time for breach of contract, breach of its common law duty of good faith, and for violations of the Texas Insurance Code § 541.060(a) and § 542.056(a).  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## II.      SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  FED. R. CIV. P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.     BREACH OF CONTRACT

Under Texas law, insurance policies are governed by the general rules of contract construction.  *Canutillo Independent School Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695,

7

700 (5th Cir. 1996); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). When the terms of the contract are unambiguous, it is the duty of the court to give effect to the intention of the parties "as expressed or apparent in writing." *American-Amicable Life Ins. Co. v. Lawson*, 419 S.W.2d 823, 826 (Tex. 1967). Whether a breach occurred is a question of law to be resolved by the court. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 432 (Tex. App.-Houston 1998). The court submits disputed fact questions to the jury only as far as a factual dispute exists concerning a party's failure to perform the contract. *Id.* at 432.

### a.  Cause of Yong Kim's Pre-Coverage Symptoms

In the instant case, the parties dispute whether Time failed to perform and therefore breached its duties under the insurance policy. Plaintiff Yong Kim suffers from cirrhosis, or scaring of the liver, caused by Hepatitis B. (Stribling Dep. 6:10-24, Aug. 15, 2008.) Her cirrhosis is complicated by HCC (*Id.* at 77:1-2) and ascites, or the collection of fluid in the abdominal cavity. (*Id.* at 76:10-24.) The ascites is further complicated by SBP, an infection that occurs spontaneously with no obvious abscess. (*Id.* at 77:5-7.) The doctors are clearly divided on the cause of Plaintiff Yong Kim's symptoms that she experienced prior to July 17, 2007. Time asserts that Plaintiff Yong Kim's cirrhosis, and the resulting complications, caused the symptoms she experienced before her policy became effective. Any treatment for these illnesses would therefore be barred by the policy's pre-existing conditions clause. Plaintiffs respond that Yong Kim's symptoms were caused by another, unrelated pre-existing condition, diverticulitis.[4] Diverticulitis is coincidental to her liver condition: it is not caused by, or related to, cirrhosis or HCC. (Brumblay Dep. 59:21-60:1.)

---

[4] Diverticulitis is a common digestive disease that occurs when the colon becomes infected and develops an abscess. (Brumblay Dep. 59:1-7.)

Dr. Stribling, Plaintiff Yong Kim's treating physician, believes her pain was caused by the "abscess that was developing in the lower left quadrant of her abdomen." (Stribling Dep. 88:17-18.) She noted that a common area for diverticulitis to occur is the left lower quadrant of the abdomen (*Id.* at 9:16-21), the place where Yong Kim experienced pain. (Doc. No. 75, Ex. E.) This was the "focal area" of Yong Kim's infection, and although it did not show up on her initial round of X-rays, it was later found and drained. (*Id.* at 88:14-22.) Dr. Stribling believes it was this focal infection that produced the symptoms that brought Yong Kim into the emergency room. (*Id.* at 89:4-9.) In Dr. Stribling's experience, some patients with cirrhosis and peritonitis experience no pain at all. (*Id.* at 88:3-4.)

Plaintiffs also present the testimony of Dr. Norman Sussman, a hepatologist who consulted on Plaintiff Yong Kim's treatment and believes that her pre-coverage symptoms were caused by diverticulitis. (Doc. No. 67, Ex. 23 at 5.) Dr. Sussman recommended that Plaintiff Yong Kim undergo a liver transplant that Time refused to cover. (Sussman Dep. 38:3-6, May 9, 2008.) He regularly treats patients who suffer from Hepatitis B and cirrhosis. (*Id.* at 12:6-19.) He testified that Hepatitis B is asymptomatic, and that it does not typically cause cramping. (*Id.* at 12:3-12.) Additionally, the form of HCC that Ms. Kim has would not cause any symptoms, including abdominal pain, a swollen belly, or cramping. (*Id.* at 16:1-11.) Dr. Sussman agrees with Dr. Stribling that Plaintiff Yong Kim's symptoms were not caused by her chronic Hepatitis B or her liver cell cancer. (*Id.* at 49:15.) Instead, he opines that her initial presentation was more of the nature of diverticulitis, and that the finding of cirrhosis and HCC was coincidental. (*Id.* at 65:1-4.)

Dr. Sussman noted that decompensated cirrhosis, or cirrhosis in its more advanced stages, could cause fluid to collect in the abdomen, the legs, internal bleeding, vomiting blood,

confusion, and jaundice, but no abdominal pain or cramping in the early stages of the disease. (*Id.* at 13:4-11.) He explained that ascites could cause abdominal pain (*Id.* at 13:3-8), or distension, but it would be unusual for it to cause abdominal cramping. (*Id.* at 14:1-3.) Additionally, he noted that it would be unusual for a liver disease patient to complain of pain in the lower left quadrant of the abdomen. (*Id.* at 45:7-11.)

The doctors employed by Time take the position that Plaintiff Yong Kim's pain was caused by her liver condition, not diverticulitis. Dr. Brumblay admitted that the symptoms of diverticulitis include "abdominal pain, fever, chills and sweating, alteration of bowel habits, irritatative pattern of emptying the bowels or an obstructive pattern." (Brumblay Dep. 59:9-15.) Ms. Kim presented with some of these symptoms, including abdominal pain and fever, which are, at least in part, symptoms of diverticulitis. (*Id.* at 61:5-11.) Regardless, Dr. Brumblay did not identify diverticulitis as a pre-existing condition. Instead, he found that her abdominal pain and worsening symptoms resulted from her cirrhosis, caused by Hepatitis B, and the resulting complications, including HCC and SPB. (Doc. No. 67, Ex. 15.) His decision was based on the medical records from Metroplex and Scott and White, and it was supported by Dr. Kenneth Beckman and Dr. John Laabs.

Defendants also rely on expert testimony of Dr. Stephen Pappas, a hepatologist and Board-certified gastroenterologist (Pappas Aff. ¶ 2, Sept. 5, 2008), who believes that Plaintiff Yong Kim "was symptomatic of liver disease before July 17, 2007." (*Id.* at ¶ 9.) Pappas reviewed Time's findings, and the medical records from Metroplex, Scott and White, Methodist Hospital, and St. Luke's Episcopal Hospital. (*Id.* at ¶ 5.) Dr. Pappas presented a very different picture of the typical symptoms associated with Hepatitis B than that offered by Dr. Sussman:

> Patients with chronic hepatitis B which has lead to cirrhosis and end stage liver disease with fluid retention in the abdomen (ascites) or complicating liver cell cancer (hepatoma)

> most commonly feel generally unwell with non-specific symptoms of fatigue and
> malaise; they often recall last feeling well several months prior to presentation. The
> retention of fluid in the abdomen or the development of liver cell cancer, while
> potentially producing no symptoms, are commonly associated with abdominal discomfort
> of increasing frequency and severity, not responsive to acid-reducing therapy, and
> complaint of increasing abdominal distension. Mrs. Kim had these symptoms. These
> symptoms are those of chronic hepatitis B with end stage liver disease (fluid retention
> and liver cell cancer) and it is my opinion with a high degree of medical probability that
> Mrs. Kim was symptomatic of chronic hepatitis B complicated by fluid retention in the
> abdomen and liver cell cancer.

(Doc. 67, Ex. 5-B.) Dr. Pappas concluded that Plaintiff Yong Kim presented with these

symptoms, and that they were caused by chronic Hepatitis B, complicated by fluid retention in

the abdomen and liver cell cancer. (*Id.*) Additionally, Dr. Pappas refutes Dr. Sussman's theory

that Plaintiff Yong Kim's symptoms were caused by diverticulitis. He points out that "a

differential diagnosis of diverticulitis was never mentioned by the physicians who had performed

literally dozens of CT scans and X-ray on Ms. Kim, all of which were adequate in quality."

(Pappas Aff. ¶ 9.) Additionally, he argues:

> Diverticulitis is a serious enough condition -- potentially fatal in a patient with liver
> disease -- that had one of the physicians at MetroPlex Hospital or Scott & White Hospital
> suspected or diagnosed this disease, such suspicion or diagnosis would certainly have
> been included in the records and a course of treatment would have been prescribed.

(*Id.* at ¶ 10.)

It is impossible to reconcile the competing expert opinions regarding the cause of

Plaintiff Yong Kim's pre-coverage symptoms. Dr. Sussman admits that neither Metroplex nor

Scott and White detected diverticulitis. (Sussman Dep. 158:21-14.) He and Dr. Stribling,

however, both concur that Plaintiff Yong Kim's symptoms were likely caused by diverticulitis,

not liver disease. While Drs. Pappas, Brumblay, Beckman, and Laabs all reach a different

conclusion, none of these doctors ever actually treated Plaintiff Yong Kim. Defendant provides

no evidence regarding the qualification of Time's three doctors or their experience in diagnosing

either diverticulitis or liver cancer. Even if such evidence were in the record, these are
credibility questions that should be presented to a jury, not resolved by this Court on summary
judgment. When viewing the record in the light most favorable to Plaintiffs, a reasonable jury
could find that Time incorrectly chose liver cancer, not diverticulitis, as Yong Kim's pre-existing
condition.[5]

Defendant asserts that this Court should determine, as a matter of law, that Plaintiff Yong
Kim's symptoms would have caused a reasonably prudent person to seek medical treatment
before her policy became effective on July 17, 2007. To support its position, Defendant relies
heavily on *Golden Rule Ins. Co. v. Attalah*, 45 F.3d 512 (1st Cir. 1995). In *Atallah*, the plaintiff
suffered from depression and was unable to take basic care of herself. She received mental
health care for her symptoms and then obtained health insurance. After her policy became
effective, doctors discovered that the source of her symptoms was actually a brain tumor. The
insurance company denied coverage for treatment of the brain tumor, relying on the "symptom
clause" in the plaintiff's insurance policy.

The First Circuit upheld the insurance company's denial of the claim, holding that, "if an
insured experiences such symptoms within the sixty months prior to the Policy's effective date,
then *whatever illness is ultimately determined to have caused those symptoms* will be deemed a
preexisting condition and will be excluded from coverage." *Id.* at 518 (emphasis added).
*Atallah* is distinguishable from the instant case because it was undisputed that the brain tumor,
not some other ailment, caused the plaintiff's symptoms. Defendant, in support of its decision,
cites the dicta of the *Atallah* opinion: "the Symptoms Clause only denies coverage for
undiagnosed illnesses if the insured is on notice that something is not right with her." *Id.* In the

---

[5] Ironically, if these allegations are indeed true, then Time gratuitously paid for Yong Kim's diverticulitis treatment,
to the tune of $390,616.91, even though it could have denied her claim as pre-existing.

same sentence, however, the First Circuit clarified its position: "to allow the insurer to contractually deny coverage for whatever may ultimately prove to be the cause of the malady in fact does not serve the policy of protecting the insurer from deceitful purchases." *Id.* The cause of Plaintiff Yong Kim's pre-coverage symptoms is disputed; therefore, the reasoning of the *Atallah* court is not applicable because it is unclear that her liver condition caused her symptoms.

Defendant also relies on *Clark v. Golden Rule Ins. Co.*, 887 F.2d 1276 (5th Cir. 1998). The plaintiff in *Clark* experienced chest pains and saw a doctor, who gave him a clean bill of health. He later obtained an insurance policy. After the plaintiff's policy became effective, his doctor discovered that he had severe blockage and had to have a bypass. The plaintiff argued that, because his condition had not been diagnosed until after the policy became effective, it was not pre-existing. The Fifth Circuit disagreed, and held that the plaintiff's pre-coverage symptoms would have caused an ordinarily prudent person to seek medical treatment. The Fifth Circuit noted that the issue was whether "in the opinion of a qualified physician, the coronary artery disease produced 'symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment.'" *Clark*, 887 F.2d at 1279. *Clark* is also distinguishable, because there was no question that coronary artery disease produced the plaintiff's symptoms.

The facts of *Hardester v. Lincoln National Life Ins. Co.*, 52 F.3d 70 (8th Cir. 1995), are more analogous to the instant case. The plaintiff suffered from fibrocystic disease, a benign condition of the breast marked by fibrous tissue and cyst formation, for ten years before her insurance policy became effective. *Id.* at 332 n. 1. One month before her policy became effective, she had her annual gynecological examination. Her doctor noted that there had been fibrocystic changes in both of her breasts and that there was "an elongated ropey mass" in her left breast. As the doctor had done in previous years, she referred the plaintiff to a surgeon for

follow-up. The plaintiff first saw the surgeon the day her insurance policy became effective. The surgeon diagnosed fibrocystic changes and ordered a mammogram, which was negative. When the plaintiff returned to the surgeon, he recommended a biopsy. The biopsy revealed that, in addition to fibrocystic tissue, the mass contained a small malignant carcinoma. The fibrocystic mass and the cancer were unrelated, but the plaintiff's doctors would not have discovered the cancer had it not been for the changes in the unrelated fibrocycistic mass. The plaintiff's insurance company refused to pay for chemotherapy, arguing that the plaintiff had received medical treatment for the mass when her doctor referred her to the surgeon. The district court found that the plaintiff's carcinoma was not a pre-existing condition and ordered the insurance company to pay, stressing that "the simultaneous occurrence of the two conditions was coincidental," and that the plaintiff went to the doctor for treatment of her fibrocystic symptoms, not cancer. 841 F.Supp. 714, 716.

On appeal, a divided panel of the Fourth Circuit reversed the district court. 33 F.3d 330 (4th Cir. 1994) (Hall, J, dissenting). After rehearing the case en banc, the Fourth Circuit affirmed the district court and adopted the dissenting opinion. While Judge Hall's decision was based on the policy's treatment clause instead of the symptom clause, he noted that, "Most of the mass was ... benign fibrous tissue. The tumor ... would not have been palpable ... but for the 'lucky' happenstance that it was encased in the unrelated benign tissue. The tumor had not caused any noticeable physical change or symptom in Mrs. Hardester before the effective date of the policy, and it had not received any medical attention." *Id.* at 338. Judge Hall emphasized that there was no causal or associative relationship between the fibrocystic tissue and the carcinoma. *Id.* He expressed policy concerns with a law that "wholly dispenses with a requirement that the patient know (or have reason to know) of his condition on the effective date

of the policy." Such concerns are present in the instant case; if Plaintiff Yong Kim's symptoms were actually caused by diverticulitis, Time cannot escape its obligation to pay for the more costly liver disease and cancer treatments.

### b. Severity of Yong-Kim's Pre-Coverage Symptoms

Even if the doctors agreed on the cause of Ms. Kim's pre-coverage symptoms, there is competing evidence about the severity of those symptoms and whether or not they would have caused "an ordinarily prudent person" to seek medical treatment or diagnosis. An ordinarily prudent person is one who is "neither an hysterical, overreacting person nor an overly blasé or unduly indifferent person." *Heck v. Time Ins. Co.*, No. 99-30309, 2000 WL 729218 at *2 (5th Cir., May 16, 2000). Based on the medical records, the testimony of her own family, and her own testimony, Plaintiff Yong Kim suffered from chronic constipation for many years prior to her July 2007 hospital visit. Dr. Sussman interprets this history to mean that she waited three days to go to the emergency room because she "just thought she was bloated .... Most people with their first episode of ascites do not realize that they have fluid in their belly. They just think they're constipated." (Sussman Dep. 50:18-20.) Based on Plaintiff Yong Kim's long history of constipation, Dr. Sussman theorizes that she thought her condition was "just another exacerbation" and that she was attempting to treat herself, which was reasonable. (*Id.* at 50:7-11.)

Additionally, the evidence regarding Plaintiff Yong Kim's symptoms at the time she arrived at the Metroplex emergency room is inconclusive. The Metroplex and Scott and White records contain a factual discrepancy not addressed by either party: whether she witnessed blood in her stool one day or two weeks before her admission. The sight of blood in the stool would typically cause alarm in an ordinarily prudent 62 year-old experiencing abdominal cramps and

lead her to seek a medical diagnosis. If this occurred only one day prior to her hospital

admission, however, then her policy was effective, and the pre-existing condition clause would

not bar coverage. This fact is therefore material, and further evidence and testimony are required

to resolve it.

It is true that, at her deposition, Plaintiff Yong Kim herself testified that the abdominal

pain was "some of the worst she had experienced in her life" and that it caused her to "double

over." Defense counsel did not ask her to identify when this severe pain occurred, or whether it

occurred before her admission date. She stated that she told her son she needed to go to the

doctor many times, but she did not say whether it was in response to these symptoms or other

health concerns. The hospital records, contemporaneous with her hospital visit, describe her

pain as moderate, as 3 out of 10, and intermittently as 10 out of 10, and as "sharp." They reflect

that she stated that these were "new symptoms" and that she had "never experienced anything

like it before." These varying descriptions of her pain, and the inconsistencies in the hospital

records, coupled with her history of self-medicating her constipation, make it difficult for the

Court to decide that, as a matter of law, her symptoms were such that an ordinarily prudent

person would have sought medical treatment or diagnosis.

### c.  Common Law Duty of Good Faith

In Texas, insurance companies owe a common law duty of good faith and fair dealing to

their insureds. *Arnold v. National County Mutual Fire Insurance Company*, 725 S.W.2d 165,

167 (Tex. 1987). As the Texas Supreme Court has explained, this duty arises from the inherent

power imbalance between the insurer and the insured:

> In the insurance context a special relationship arises out of the parties' unequal
> bargaining power and the nature of insurance contracts which would allow unscrupulous
> insurers to take advantage of their insureds' misfortunes in bargaining for settlement or
> resolution of claims .... Without such a cause of action insurers can arbitrarily deny

> coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Id.* An insurer breaches its duty if it denies or delays payment of a claim after its liability becomes reasonable clear. *Universal Life Insurance Company v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997). Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the fact-finder. *Id.* A court is entitled to decide the issue as a matter of law, however, when there is no conflict in the evidence. *Id.*

Plaintiffs contend that Time knew, or should have known, that it was reasonably clear that Plaintiff Yong Kim's liver treatment was covered by the policy. Plaintiffs refer to the conflicting medical testimony discussed above, alleging that Dr. Sussman and Stribling's opinions should have caused Time to know that Plaintiff Yong Kim's treatment was covered. Evidence of breach of contract, however, is not necessarily sufficient to demonstrate that a defendant acted in bad faith. *Lyons v. Millers Casualty Insurance Company of Texas*, 866 S.W.2d 597, 600 (Tex. 1993). When medical evidence is conflicting, liability is not reasonably clear, and it cannot be said that the insurer had no reasonable basis for denying the claim unless the medical evidence on which the insurer based its denial is unreliable, and the insurer knew or should have known that to be the case. *Provident American Insurance Co. v. Castenda*, 988 S.W.2d 189, 194 (Tex. 1998). Plaintiffs allege that the determinations made by Drs. Brumblay, Beckman, and Laabs are unreliable, and Time should have known they were unreliable. Plaintiffs assert that none of these doctors consulted medical literature before making their decision, that they are not specialists in diagnosing or treating liver disease, and that, as Time employees, their opinions are unduly biased.

17

The Texas Supreme Court has acknowledged that an insurer's reliance on an expert's report, standing alone, cannot defeat a finding of bad faith if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997). At issue in *Nicolau* was whether the plaintiff's homeowner's insurance covered foundation movement problems occurring under the plaintiff's home. In denying the plaintiff's claim, the insurance carrier relied on a report from an engineering firm which concluded that the foundation damage was not related to a water leak but was instead caused by an inherent vice or by settling problems, both of which were not covered by the plaintiff's policy. At trial, the plaintiff presented evidence that the engineering firm's report was not objectively prepared, and that the carrier was aware of its lack of objectivity. The plaintiff demonstrated that the engineering firm did a substantial amount of its work for insurance companies and that the individual engineer did eighty to ninety percent of his work for insurance companies. One of the insurance carrier's superintendents testified that the engineering firm was known to hold the general opinion that plumbing leaks were unlikely to cause foundation damage.

The plaintiff's contractor testified that he had reviewed eighty or ninety of the engineering firm's reports in the local area. He knew of only two instances in which the engineering firm concluded that a leak contributed to foundation movement. He further testified that, to his knowledge, neither of the engineers who prepared those reports ever worked on another case involving slab foundation. Of particular importance was the contractor's testimony that the engineer's report was based on inadequate information. The engineering firm did not perform any additional testing in reaction to a report from another company that discussed the moisture content around the plaintiff's house. The engineering firm found that these water levels

18

should not be considered that high; three other experts, including the insurance carrier's own, disagreed, calling the engineering firm's conclusion "unreasonable."

The Texas Supreme Court found that, taken all together, this was sufficient evidence that the insurance carrier denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear. Plaintiffs do not provide sufficient evidence to allow us to reach a similar conclusion. Plaintiffs' assertion that Drs. Brumblay, Beckman, and Laabs are not qualified to determine the cause of Yong Kim's symptoms is not supported: the record contains no discussion of the doctors' medical specialties or professional backgrounds. Plaintiffs provide no information regarding the industry standard for a claim adjudicator's qualifications. It is quite possible that, even if all these doctors are not hepatology specialists, they are still more than qualified to make a reasonable determination of the cause of Plaintiff Yong Kim's symptoms.

It is significant that Plaintiffs offer no competing expert testimony critiquing the Time doctors' methods for determining the cause of Yong Kim's symptoms. Plaintiffs demonstrate that these doctors did not refer to medical literature or studies before deciding that Yong Kim's symptoms arose from a pre-existing condition. They offer no evidence, however, indicating that reviewing medical studies would be necessary to determine what caused Plaintiff Yong Kim's symptoms. *See e.g. Maynard v. Lloyds*, No. 3-cv-2428M, 002 WL 1461923 at *5 n.7 (N.D.Tex., July 2, 2002) (holding that a plaintiff's argument that an insurer's inspector was unreliable because he did not perform certain tasks as part of his inspection failed because the plaintiffs did not present competent evidence that the investigation was inadequate).

Plaintiffs argue that, because the three doctors are all Time employees, their claim determinations are inherently self-interested and unreliable. Plaintiffs do not present evidence

like that available in *Nicolaus*, however, to demonstrate bias. Plaintiffs offered no evidence indicating that these doctors deny claims on the basis of a pre-existing condition at a rate much higher than that which they grant claims. Even if they had offered such evidence, merely employing an expert whose reports generally favor the insurer does not necessarily indicate bad faith. *Travelers Personal Security Insurance Company v. McClelland*, 189 S.W.3d 846, 854 (Tex. Ct. App.-Houston 2006). Instead, the plaintiff must show that the expert was so biased that her determination was unreliable, and that the insurance carrier was aware of this unreliability. *See e.g. Nicolaus*, 951 S.W.2d at 448. Plaintiffs have failed to produce any such evidence of bias.

Finally, Plaintiffs argue that, because Time does not have a policy requiring that claim appeals be independently reviewed, Dr. Laabs' decision of Plaintiffs' appeal is inherently unreliable. While Time's lack of such a policy might be unwise, Dr. Laabs testified that he gave Plaintiffs' claims a "fresh" review. He did not consult with Dr. Brumblay or review Dr. Brumblay's notes before he decided Plaintiffs' appeal. The process used to decide Plaintiffs' individual appeal, therefore, was sufficiently independent and reliable. As the facts surrounding Plaintiffs' allegations are undisputed, we find, as a matter of law, that Time did not act in bad faith when it denied Plaintiffs' claims.

### d. Deceptive Practices

Plaintiffs allege that Defendants have violated several provisions of the Unfair Settlement Practices Act contained in the Texas Insurance Code. TEX. INS. CODE § 541.060. A cause of action for unfair insurance practices arising from an insured's denial of a claim requires the same proof as a common law action for bad faith. *Bates v. Jackson Nat'l Ins. Co.*, 927 F.Supp. 1015, 1025 (S.D.Tex. 1996). Texas Insurance Code violations relating to claims handling are reserved

for cases in which the insurer was actually aware that it was handling the claim in a way that was false, deceptive, or unfair. *Minnesota Life v. Vazquez*, 192 S.W.3d 774, 780 (Tex. 2006). Each alleged violation will be discussed in turn.

First, Plaintiffs assert that Time violated the Act by misrepresenting to Plaintiffs a material fact or policy provision relating to the coverage at issue. TEX. INS. CODE § 541.060(a)(1). The basis for this claim is the discrepancy between the definition of "pre-existing condition" contained in the policy and the denial letter. The policy describes a pre-existing condition as a one that "produced symptoms … which reasonably should have caused or would have caused an ordinarily prudent person to seek diagnosis or treatment." The denial letter, in contrast, characterizes it as a "condition [that] produced symptoms that would cause an ordinarily prudent person to seek a diagnosis, care or treatment." The differences between the two definitions are immaterial. Plaintiffs have not demonstrated how the slight changes in the wording of the denial letter misled or confused them.

Second, Plaintiffs allege that Time violated the Act by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear. *Id.* at 541.060(a)(2). As discussed above, Plaintiffs have not demonstrated that Time's liability was "reasonably clear" when it denied their claims.

Third, Plaintiffs argue that Time failed to promptly provide Plaintiffs a reasonable explanation of the policy basis, in relation to the facts or applicable law, for Time's denial of Plaintiffs' claims. *Id.* at 541.060(a)(3). The denial letter informed Plaintiffs that the condition treated by Scott and White and Metroplex manifested itself prior to the effective date of the policy, so coverage was barred by the policy's pre-existing condition clause. Plaintiffs do not specify how the letter failed to give a reasonable explanation of the policy basis for the denial. It

specifically cited the policy's pre-existing condition clause and replicated, with immaterial defect, the policy's language.

Next, Plaintiffs allege that Time failed within a reasonable time to affirm or deny coverage of Plaintiffs' claims. *Id.* at 541.060(a)(4). A material fact issue does remain regarding Time's approval of Plaintiff Yong Kim's diverticulitis treatment. One of Plaintiff Yong Kim's physicians first diagnosed diverticulitis in December 2007; Dr. Brumblay learned of the diagnosis sometime after that and requested additional medical records. He never received them; however, in April 2008, he decided that her diverticulitis was not a pre-existing condition. There is no evidence in the record regarding when, or if, Time received the additional medical records and why Dr. Brumblay chose to approve Yong Kim's treatment without the additional records. It is therefore possible that a jury could find that Time took an unreasonable amount of time to approve Plaintiff Yong Kim's diverticulitis treatment.

Finally, Plaintiffs assert that Time violated the Act by refusing to pay a claim without conducting a reasonable investigation with respect to the claim. *Id.* at 541.060(a)(7). As discussed above, Plaintiffs have presented no evidence to demonstrate that Time's investigation of Plaintiffs' claims was unreasonable.

### e.  Prompt Payment

Plaintiffs allege that Defendant did not timely process Plaintiffs' claims. An insurer is required to notify a claimant, in writing, of its acceptance or rejection of a claim no later than the fifteenth day after the date the insurer receives all items, statements, and forms required by the insurer to secure proof of loss. TEX. INS. CODE § 542.056(a). As to Time's denial of Plaintiffs' claims for treatment of Yong Kim's liver disease, Plaintiffs do not dispute Time's position that it first received Plaintiffs' claims on August 6, 2007. Time's records indicate that, as of September

25, 2007, it had not received all the Scott and White medical records required to decide Plaintiffs' claims. Sometime between September 25 and September 27 these materials must have arrived, because Dr. Brumblay issued his decision on September 27. At most, Time waited two days after receiving all the necessary documents to decide Plaintiffs' claims. Its decision denying coverage for treatment of Plaintiff Yong Kim's liver condition was well within the statutory limits, and Plaintiffs do not dispute Time's evidence regarding when the medical records were received and when the claim was processed.

As discussed above, there are unresolved facts regarding Time's approval of Plaintiff Yong Kim's diverticulitis treatment. The record does not discuss when Plaintiffs submitted a claim for this condition, whether their claim was ever acknowledged, and how long it took, from the time it received the claim, for Time to ultimately approve it. These are facts that must be decided by the jury.

## IV.    CONCLUSION

Defendant's Motion for Summary Judgment is **DENIED IN PART** as to Plaintiffs' breach of contract claims and their claims pursuant to TEX. INS. CODE § 541.060(a)(4) and §542.056(a) as they relate to Time's approval of Yong Kim's diverticulitis treatment. Defendant's Motion is **GRANTED IN PART** as to Plaintiffs' claim with respect to Time's common law duty of good faith and their claims brought pursuant to TEX. INS. CODE § 541.060(a)(1), § 541.060(a)(2), § 541.060(a)(3), and § 541.060(a)(7). Additionally, Defendant's Motion is **GRANTED IN PART** as to Plaintiffs' § 541.060(a)(4) and § 542.056(a) claims related to Time's denial of Yong Kim's liver disease treatment.


**IT IS SO ORDERED.**

**SIGNED** this 22nd day of December, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE